UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DARRELL ARCHER,

     Plaintiff,

v.                                 Case No: 8:16-cv-3067-T-36AAS

WAL-MART STORES EAST, LP, et al.,

     Defendants.

_____/

# ORDER

This matter comes before the Court upon Defendants' Motion for Summary Judgment (Doc. 259) (the "Motion"), Plaintiff's response in opposition (Doc. 276), and Defendants' reply in support of the Motion (Doc. 278). In the Motion, Defendants seek final summary judgment in their favor on all remaining counts of Plaintiff's complaint. The Court, having considered the parties' submissions and being fully advised in the premises, will grant the Motion.

## I.    STATEMENT OF FACTS[1]

On or near the date of the incident that is the subject of this lawsuit, Wal-Mart maintained a standard operating procedure entitled "APCS: Receipt Checking" (the "policy"). Doc. 276-1.[2] The policy provided direction to certain Wal-Mart employees tasked with checking customer receipts. *Id.*; Doc. 209-3, Deposition of Kristina Wood ("Wood Depo.") at 15:1-15:6; Doc. 209-2, Deposition of Charles Caraway ("Caraway Depo.") at 27:3-27:25, 28:22-29:5. Under the policy, receipt checkers should ask to see a receipt when a customer is leaving with "[l]arge un-bagged

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including depositions, declarations, and exhibits (Doc. 209-1; Doc. 209-2; Doc. 209-3; Doc. 209-4; Doc. 209-5; Doc. 209-6; Doc. 209-7; Doc. 214; Doc. 215-1; Doc. 276-1; Doc. 276-2; Doc. 276-3), as well as the parties' Joint Stipulation of Undisputed Material Facts ("SF") (Doc. 304).

[2] The policy, a copy of which is attached as an exhibit to Plaintiff's response and which Plaintiff relies on, is dated April 17, 2015. *Id.*

high value items, i.e., all TVs, totes, bikes, etc.," when a customer is seen leaving "from the salesfloor and not the frontend," or when management or asset protection requests a receipt check. Doc. 276-1. If a customer who is asked for a receipt does not have one, the receipt checker should "offer to hold the merchandise until the customer can find their receipt." *Id.* If the customer cannot find their receipt, the receipt checker should relay information provided by the customer—such as which register lane they checked out at—to management to verify the purchase. *Id.*

In the event that a customer "refuses to produce a receipt," the receipt checker should "[p]olitely offer to hold the merchandise until the customer can find their receipt." *Id.* at p. 2. If the customer "refuses" to allow the employee to hold the merchandise, the employee should "allow them to leave, and document the event" on a standard form and notify management or asset protection. *Id.* The provision allowing a customer who refuses to provide his receipt to leave the store is in place for the protection of Wal-Mart's employees. Doc. 215-1, Deposition of Mark Gammon ("Gammon Depo.") at 7:21-7:23.[3]

The policy applies on normal days of business, but may not apply on non-standard days. Wood Depo. at 15:18-15:25; Gammon Depo. at 15:17-15:21. November 26, 2015 was Thanksgiving. On that evening, Wal-Mart Stores East, LP ("Wal-Mart" or the "store") located at 7450 Cypress Gardens Boulevard, Winter Haven, Florida was having a major sales event. SF at ¶¶ 3a-3b. Because the sales event would attract a "magnitude of people" that evening, Wal-Mart

---

[3] In response to Plaintiff's questioning at a June 6, 2018 deposition, Mark Gammon, a Wal-Mart manager, further described the purpose of the provision.

      Q.      Do you know why the policy says that you—if the customer refuses to allow you to hold the merchandise, allow them to leave? Do you know why?
      A.      Again, the protection of our associates.
      Q.      What do you mean by—I'm sorry. You said that before. I don't know what you mean by protect—
      A.      To ensure that there's not going to be a physical altercation or something between our associates and a customer. We want to protect our associates.
Gammon Depo. at 22:22-23:5.

decided to implement different procedures, requiring receipt checking for at least all merchandise that was not bagged.[4] Wood Depo. at 58:3-58:9; Caraway Depo. at 23:15-23:19; Gammon Depo. at 15:17-15:21; Phillips Depo. at 18:10-18:12. In addition, Wal-Mart decided to add police presence to the store that day. Gammon Depo. at 15:23-15:24.

At least three police officers from the City of Winter Haven (the "City") were present at Wal-Mart for the sales event pursuant to a special detail contract between Wal-Mart and the City. SF at ¶ 3c. The three officers, all dressed in full uniform, were Sergeant Ken Nichols ("Sergeant Nichols"), Sergeant Dan Gaskin ("Sergeant Gaskin"), and Officer Brad Webster ("Officer Webster") (collectively, the "Officers").[5] SF at ¶¶ 3c-3d. The Officers were paid by Wal-Mart for their time, but were not acting under the supervision of Wal-Mart. Phillips Depo. at 10:6-10:10; Wood Depo. at 43:25-44:1, 57:4-57:8; Doc. 209-6, Deposition of Sergeant Gaskin ("Gaskin Depo.") at 62:24-63:2. *See also* SF at ¶ 3e (agreeing the Officers were acting in the course and scope of their employment with the City).

Plaintiff Darrell Archer ("Archer") went to the store that evening. *Id.* at ¶ 3a. The store was very busy with holiday shoppers. *Id.* at ¶ 3b. Using the self-checkout line, Archer purchased a large screen television at the store for a total price of $159.43. *Id.* at ¶ 3a. A Wal-Mart employee, Diamond Hernandez ("Hernandez") helped Archer complete his transaction and handed him his receipt. Doc. 209-4, Deposition of Diamond Hernandez ("Hernandez Depo.") at 9:21-9:24. Archer placed his receipt in his pocket and proceeded to exit the store. SF at ¶ 3g. Archer walked toward

---

[4] Although one Wal-Mart employee testified receipts for all un-bagged merchandise should be checked, Wood Depo. at 58:3-58:9, two other Wal-Mart employees testified that all receipts were to be checked. Doc. 209-5, Deposition of John Phillips ("Phillips Depo.") at 18:10-18:12; Caraway Depo. at 23:15-23:19. Whether receipts were to be checked for all items or for only non-bagged items is not material to this case, as it is undisputed that Plaintiff's television was not bagged.

[5] On October 10, 2019, the Officers filed a notice of settlement. Doc. 279. Prior to that, the Winter Haven Police Department, the City, and Walmart Inc. were dropped from this action. Doc. 132; Doc. 183. The only claims remaining in this action are those against Wal-Mart and four of its employees.

the exit, pushing the shopping cart that held the television. Doc. 214, Incident Video ("Video") at 00:00-00:08.

As Archer began his exit, another Wal-Mart employee, Kanara Harris ("Harris"), asked Archer to show his receipt for the purchase of the television. SF at ¶ 3h. Harris had routinely attempted to ask all customers for receipts as they exited the store that evening. *Id.*

Archer refused to show Harris his receipt. *Id.* at ¶ 3i. As Archer pushed the shopping cart toward the exit, Harris[6] followed, stepping to the right of Archer, then stepping in front of the shopping cart and placing his hands on the shopping cart. Video at 00:11-00:22; *see also* Doc. 209-1,[7] Deposition of Darrell Archer ("Archer Depo.") at 77:19-78:14. Harris continued to block the shopping cart, but did not physically block Archer. Archer Depo. at 161:15-161:19; Video at 00:11-00:33. Archer continued to attempt to leave the store with the shopping cart and television, attempting to maneuver around Harris. Video at 00:22-00:28. Archer testified he believed Harris told him he could not leave without showing his receipt. Archer Depo. at 182:17-183:5.

Harris gestured, apparently waving to someone, and a few seconds later, Officer Webster arrived at the scene. Video at 00:21-00:40; Archer Depo. at 120:21-120:25, 184:24-185:4. Officer Webster stepped to the right of Archer and placed his hands on the right side of the shopping cart and then at the front of the shopping cart. Video at 00:33-00:49.

---

[6] The parties do not explicitly agree in the Joint Stipulation of Undisputed Material Facts that Harris took these actions; however, the undisputed facts evident in the summary judgment record show this was Harris. The parties agree Harris asked Archer to show his receipt and upon Officer Webster's arrival, Harris left and resumed his duties. SF at ¶¶ 3h, 3l. The Video and Archer's deposition testimony indicate that the same person also took actions with the shopping cart and gestured for assistance. *See* Video at 00:01-00:46 (showing the same person encountering Archer near the exit, stepping to the right and in front of the shopping cart, and gesturing for someone); Archer Depo. at 77:19-78:14 (Archer testimony stating that "a guy" asked Archer for his receipt and, when Archer refused, "jumped in front of [the shopping] cart and blocked it" and "hollered for security").

[7] Excerpts of Archer's deposition testimony and excerpts of other deposition testimony on which the parties rely are filed with Archer's response in opposition to Defendants' Motion. *See* doc. 276. However, because the full content of those transcripts were filed earlier at docs. 209-1 through 209-7 and at doc. 215-1, the Court cites to those.

When Officer Webster arrived, Harris walked away, returning to his previous duties. *Id.* at 00:36-01:32; SF at ¶ 3l. Officer Webster requested Archer's receipt. SF at ¶ 3j. Archer refused to show Officer Webster his receipt. *Id.* at ¶ 3k; Archer Depo. at 79:1-79:11. Officer Webster continued to keep a hand on the shopping cart. Archer Depo. at 121:21-121:23; Video at 00:49-01:11.

A male dressed in a t-shirt, Wal-Mart employee Charles Caraway ("Caraway"), was next to arrive at the scene just after Officer Webster. Video at 00:45-00:50; Archer Depo. at 121:16-121:20. Less than one minute later, another Wal-Mart employee, a female named Kristina Wood ("Wood"), arrived. Video at 01:39-01:45; Archer Depo. at 121:24-122:4. A few seconds later, Sergeant Nichols arrived. Video at 01:47-01:54; Archer Depo. at 122:5-123:7, 185:5-185:7; Doc. 276-3 at p. 2. About one minute later, Sergeant Gaskin arrived. Video at 02:53; Archer Depo. at 185:8-185:10.[8]

Archer testified that during this time, one of the sergeants told him he was not allowed to leave. Archer Depo. at 55:1-55:9, 55:17-55:24. Archer also testified he could not leave because he "was being blocked." Archer Depo. at 103:22-103:23. However, Sergeant Gaskin testified no one ever told Archer he was not free to leave. Gaskin Depo. at 90:24-91:1.

---

[8] Concerning the additional arrivals on scene, the parties do not explicitly agree in the Joint Stipulation of Undisputed Material Facts that Caraway was the male dressed in a t-shirt. *See* SF. However, the undisputed facts evident in the summary judgment record show the male dressed in a t-shirt was Caraway. Wood testified that when she arrived at the scene, one of the Officers and Caraway were already there. Wood Depo. at 35:16-36:4. At the time Wood arrived, only Officer Webster and the male in the t-shirt were there with Archer. Video at 01:39-01:45. Sergeant Nichols' police report states that when he arrived on scene, Archer was standing with "a member of the management team, Of[ficer] Webster and Charles Caraway (Member of the asset protection team.)." Doc. 276-3 at p. 2. At this point, other than Archer, Officer Webster, and Sergeant Nichols, only Wood and the male in the t-shirt were present. Video at 00:45-1:54. Also, Caraway and Wood each testified that Caraway was a member of Wal-Mart's asset protection team and that Wood was a manager. Caraway Depo. at 9:12, 16:10, 52:7; Wood Depo. at 7:1-7:4, 50:16-50:18, 24:15-25:2. Finally, Carraway testified about the actions he took that evening, which are consistent with the actions of the male wearing the t-shirt in the Video. *See* Caraway Depo. at 26:7-26:11, 31:1-32:2, 53:23-54:20, 60:11-60:19.

Sergeant Nichols' police report describing the incident provides Archer stated "he had a right to the property and wished to leave with it" and Caraway "advised that [Archer] would not be able to exit the store without a receipt for the television." Doc. 276-3 at p. 2. Later in the report, Sergeant Nichols also wrote that Archer "was advised that he could not leave with the merchandise without a receipt." *Id.*

Caraway testified Archer was told "over and over again that [he] w[as] free to go." Caraway Depo. at 32:13-32:14. Caraway's recollection was that Archer was free to leave, but that he could not take the television unless he provided his receipt. *Id.* at 32:18-32:20, 36:13-36:16, 37:16-37:18 (testifying that Archer "was free to leave at all times" but could not take the television unless he "proved that [he] purchased it"). Caraway recalled telling the Officers that Archer could not leave with the merchandise without proof of purchase. *Id.* at 62:14-62:17.

Wood also recalled that Archer was free to leave at any time, and that the Officers told him this. Wood Depo. at 40:12, 40:24-40:25, 42:12-42:18, 49:4-49:10; 49:25-50:12, 55:20, 56:16-56:20, 57:13-57:14. Wood testified she "was not stopping [Archer] from leaving, even with the television." *Id.* at 56:21-56:24.

Throughout, Archer continued to refuse to provide his receipt. Archer raised his voice, pointed a finger at the Officers and the Wal-Mart employees, and was argumentative. Doc. 209-7, Deposition of Sergeant Nichols ("Nichols Depo.") at 87:18-88:1, 90:8. According to Archer's testimony, one of the two sergeants, possibly Sergeant Nichols, told Archer at some point that he could arrest Archer for theft. Archer Depo. at 54:5-54:21.[9]

---

[9] However, both Caraway and Wood testified they never heard any of the Officers threaten to arrest Archer. Caraway Depo. at 25:7-25:19, 30:1-30:7, 54:21-54:23; Wood Depo. at 49:11-49:13. Sergeant Gaskin testified he never heard Sergeant Nichols threaten to "lock up" Archer. Gaskin Depo. at 44:14-44:15, 56:12-56:14. Sergeant Nichols testified he never told Archer he would be "lock[ed] up." Nichols Depo. at 42:8-42:9. Sergeant Nichols stated that if he had threatened to arrest Archer at any point, it would have been in combination with the issue of trespass, not theft. Nichols Depo. 56:14-57:2.

After approximately three minutes of standing and talking with the Officers and Wal-Mart employees, Archer pushed his shopping cart forward in an attempt to leave with his television. SF at ¶ 3m; Archer Depo. at 123:8-123:13; Video at 03:15-03:21. Sergeant Gaskin removed the television from Archer's shopping cart and set it on the floor. SF at ¶ 3n; Video at 03:21-03:39; Archer Depo. at 187:19-188:7.[10]

Caraway requested that Archer be trespassed from the property. SF at ¶ 3o; Doc. 276-3 at p. 2. Sergeant Nichols told Archer he would have to leave or he would be arrested for trespass. Archer Depo. at 90:23-91:6; Nichols Depo. at 43:16-43:24. Archer asked Nichols whether he was free to leave, and Nichols advised he was. Doc. 276-3 at p. 3. Archer asked whether he could leave with the television; Nichols "advised that he could not unless he was able to provide the receipt." *Id.*

Archer testified it was possible he was told he could leave with the television if he showed his receipt. Archer Depo. at 93:12-93:14. Nonetheless, Archer "preferred to assert [his] right not to have to show that receipt." *Id.* at 93:15-93:18.

Archer left the premises without the television, thinking that he would be arrested if he did not leave. SF at ¶ 3p; Video at 05:25-05:35. Officer Webster and Sergeant Nichols followed Archer out into the parking lot as he exited the store. Nichols Depo. at 44:12-44:16; Video at 05:25-05:35.

Wal-Mart's security camera recorded images of the incident, beginning at approximately 6:57 p.m. when Archer encountered Harris and continuing through to when Archer left the store at approximately 7:02 p.m. Video at 00:00-05:37. During those five to six minutes, Archer was

---

[10] Archer believes he heard one of the Wal-Mart employees, possibly Caraway, tell the Officers to remove the television. Archer Depo. at 179:12-179:19. This is disputed. Caraway testified that he did not tell anyone to take the television out of the shopping cart and did not know of any Wal-Mart employee who instructed the Officers to take the television. Caraway Depo. at 37:1-37:13, 51:11-51:13. Wood also testified that she did not instruct the Officers to take the television and did not know of any Wal-Mart employee who did. Wood Depo. at 61:3-61:12. Sergeant Gaskin testified he took the television out of the shopping cart in an effort to deescalate what had become an aggressive situation. Gaskin Depo. at 55:3-55:15.

never moved from the scene of the incident, taken to another room, or arrested. SF at ¶¶ 3q-3r; Archer Depo. at 53:18-54:4; Video at 00:00-05:37.

After Archer left the store, Caraway took the television and stored it in the asset protection office. SF at ¶ 3s; *see also* Video at 7:30-8:00. Later that evening, Wal-Mart's asset protection team verified that Archer had in fact purchased the television. SF at ¶ 3t; Hernandez Depo. 10:3-10:9.

Days later, Archer went to the police department and met with an Officer Hoverkamp to discuss the incident. Archer Depo. at 104:19-105:12. Officer Hoverkamp later called Archer and informed him that he was allowed to return to the store to pick up his television and that if he no longer wanted the television, he would be able to get a refund at Wal-Mart's customer service desk. *Id.* at 105:18-106:4. Archer does not recall Officer Hoverkamp telling him that, but admits that his concern at that point was not about getting the television or his money back. *Id.* at 106:5-111:4. Archer does not believe he ever attempted to call Wal-Mart to ask about getting his television back. *Id.* at 106:18-106:20.[11]

## II.  LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged

---

[11] Additional testimony provides Archer was informed the day after the incident, November 27, 2015, that he could pick up the television. Phillips Depo. at 31:2-31:7.

if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine" only if a reasonable jury, considering the evidence present, could find for the nonmoving party, and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 Fed. Appx. 852, 858 (11th Cir. 2006).

## III.    DISCUSSION

### A.  Count I – False Imprisonment as to Wal-Mart, Wood, Caraway, Harris

Defendants[12] argue they are entitled to judgment as a matter of law on Archer's false imprisonment claim for three reasons. First, Defendants contend Archer cannot establish he was detained by any Wal-Mart employee. Second, Defendants argue, even if Archer could establish he was detained by a Wal-Mart employee, Defendants are immune under Florida's shopkeeper immunity statute. Third, Defendants contend any detention of Archer was lawful because Archer consented. The Court reviews each of Defendants' arguments, and Archer's responses thereto, in turn.

"False imprisonment is the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and deprivation of his liberty." *Harder v. Edwards*,

---

[12] Throughout this Order, the Court refers to the remaining defendants—Camp, Caraway, Harris, Wal-Mart, and Wood—collectively as "Defendants." That term does not include defendants no longer a part of this action.

174 So. 3d 524, 530 (Fla. 4th DCA 2015) (quoting *Johnson v. Weiner*, 19 So. 2d 699, 700 (Fla. 1944)). "Unlawful" means that the confinement was "unreasonable and unwarranted under the circumstances." *Harris v. Lewis State Bank*, 436 So. 2d 338, 341 (Fla. 1st DCA 1983) (emphasis deleted, citation omitted). Thus, the following elements are required to show false imprisonment: 1) the "detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or 'color of authority' and 4) which is unreasonable and unwarranted under the circumstances." *Harder*, 174 So. 3d at 530 (citation omitted).

    *1. Whether Archer was Detained*

        a. Detention in general

    The summary judgment record in this case provides little support for the premise that Archer was detained. Less than six minutes elapsed between the time Archer encountered Harris and left the store. During those few minutes, Archer was not touched, was not asked to accompany the Wal-Mart employees or Officers to another location, and was not arrested. These facts alone distinguish this case from the majority of retail-related false imprisonment claims brought pursuant to Florida law. *See, e.g., Morris v. Albertson's, Inc.*, 705 F.2d 406, 408 (11th Cir. 1983) (plaintiff accused of shoplifting agreed to accompany store personnel to store office); *Harder*, 174 So. 3d at 529 (plaintiff arrested and held almost 24 hours); *Louis v. Costco Wholesale Corp.*, 719 So. 2d 1226, 1227 (Fla. 4th DCA 1998) (plaintiff arrested and held for several hours); *Canto v. J.B. Ivey & Co.*, 595 So. 2d 1025, 1027 (Fla. 1st DCA 1992) (plaintiffs accused of shoplifting agreed to accompany store personnel to store office, where they were held for about two hours); *Hood v. Zayre Corp.*, 529 So. 2d 1197, 1198 (Fla. 5th DCA 1988) (plaintiff accused of shoplifting taken to store security office); *Hernandez v. K-Mart Corp.*, 497 So. 2d 1259, 1259 (Fla. 3d DCA 1986) (plaintiff accused of shoplifting agreed to accompany store security guard to a room in the back of

the store where she was interrogated, threatened with police action, and strip-searched); *DeMarie v. Jefferson Stores, Inc.*, 442 So. 2d 1014, 1015 (Fla. 3d DCA 1983) (plaintiff questioned in room in the back of the store and subsequently arrested); *Weissman v. K-Mart Corp.*, 396 So. 2d 1164, 1166 (Fla. 3d DCA 1981) (plaintiff invited to store's security office where he was held for at least 15 to 20 minutes, but less than 30 minutes, and charged by police with shoplifting); *Food Fair Stores, Inc. v. Kincaid*, 335 So. 2d 560, 561 (Fla. 2d DCA 1976) (plaintiff accused of shoplifting was asked to step into manager's office, where she was held for about 30 minutes until police arrived and then held another 10 to 15 minutes until she was put in a police car and taken to the police station); *Anderson v. Wal-Mart Stores, Inc.*, No. 12-61047-CIV, 2013 WL 773473, at *2 (S.D. Fla. Feb. 28, 2013) (plaintiff arrested after she failed to cooperate with police officer who had approached her after being alerted by store personnel that plaintiff had refused to show her receipt); *Mahani v. Wal-Mart Stores, Inc.*, No. 08-80654-CIV, 2009 WL 1834224, at *3 (S.D. Fla. June 25, 2009) (plaintiff was escorted to the asset protection office by store personnel); *Ciccariello v. Kash N' Karry Food Stores, Inc.*, No. 8:07-CV-592-T-30TGW, 2008 WL 4426710, at *2 (M.D. Fla. Sept. 26, 2008) (plaintiff arrested for retail theft after being observed by store personnel).

Archer does not direct the Court to a single case with facts similar to those undisputed here, where a plaintiff, questioned for a matter of minutes and not moved from the scene nor arrested, brought a successful claim for false imprisonment. A case cited by Defendants, however, suggests such circumstances, where a customer is stopped for a few minutes and given the option to leave without property, may not give rise to a detention. *See Moore v. Federated Retail Holdings, Inc.*, No. 6:07-CV-1557-ORL-31GJK, 2009 WL 129628, at *4 (M.D. Fla. Jan. 20, 2009) (stating it was "far from clear" whether plaintiff was "ever detained" where he was stopped near a store exit for about 20 minutes and able to leave the store without his property); *see also Anderson*, 2013 WL

773473, at *6 (law enforcement did not seek to detain customer upon first approach, but "only sought to get [her] to provide a receipt for her purchases").

Nonetheless, viewing all evidence in a light most favorable to Archer, genuine issues of material fact exist with respect to whether Archer was free to leave the store without the television before being issued a trespass warning. Although the Wal-Mart employees and Officers testified Archer was free to leave at any point without the television, Gaskin Depo. at 90:24-91:1; Caraway Depo. at 32:13-32:14, 32:18-32:20, 36:13-36:16; Wood Depo. at 40:12, 40:24-40:25, 42:12-42:18, 49:4-49:10, 49:25-50:12, 55:20, 56:16-56:20, 57:13-57:14, Archer testified to other circumstances, including that at least one of the Officers threatened him with arrest and told him he was not free to go. Archer Depo. at 53:14-53:18, 55:3-55:24.[13]

Because genuine issues of material fact exist as to the first element of Archer's claim for false imprisonment, detention, the Court assumes for purposes of further analysis that Archer was not free to leave the store. However, the Court's analysis as to the first element does not end there. Assuming Archer was not free to leave, the Court must address whether there is a dispute of material fact as to which, if any,[14] Wal-Mart employee detained Archer.

### b. Detention by any Wal-Mart employees

A private individual cannot be held liable for false imprisonment pursuant to Florida law unless that person "personally and actively participated therein, directly or by indirect

---

[13] In the Motion, Defendants dispute Archer's expert testimony, where Archer's expert apparently testifies and concludes that Archer was detained. However, Archer's response does not discuss any expert findings. Because Archer does not utilize expert testimony in support of his position, the Court need not address Defendants' anticipatory arguments.

[14] As Defendants point out, at times throughout this case, Archer has collectively referred to Defendants, the Officers, and others as "they." *See, e.g.*, Archer Depo. at 57:2-57:11, 78:14-78:24, 81:16-81:20, 86:23-86:25. But evidence that one of the Officers, or that all three Officers, detained Archer, without more, is insufficient to implicate any of the Defendants. And evidence that one individual Wal-Mart employee detained Archer, without more, is insufficient to implicate any other individual Wal-Mart employee. Accordingly, the Court turns toward an analysis of each Wal-Mart employee's specific actions to determine whether any individual Wal-Mart employee had anything to do with the assumed detention.

procurement." *Harder*, 174 So. 3d at 530 (quoting *Johnson*, 19 So. 2d at 701). A citizen that provides information to law enforcement, without more, does not commit the tort of false imprisonment. *Id.* (citing *Pokorny v. First Fed. Sav. & Loan Ass'n of Largo*, 382 So. 2d 678, 682 (Fla. 1980)). That remains true even where an individual "makes an honest, good faith mistake in reporting an incident." *Id.*

To be liable in tort for false imprisonment, an individual must either "actually detain" another or "instigate" such detention. *Id.* To "instigate" a detention means to take "an active role in encouraging or procuring" the same by

> [w]ords or acts which direct, request, invite or encourage the false imprisonment itself. In the case of an arrest, it is the equivalent, in words or conduct, of "Officer, arrest that man!" It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.

*Id.* (quoting Restatement (Second) of Torts, section 45A, Comment c).

In *Lozada v. Hobby Lobby Stores, Inc.*, a manager of the store, Michael Licari, called law enforcement to report that an employee, plaintiff Ismael Lozada, was planning a mass shooting. 702 Fed. Appx. 904, 906 (11th Cir. 2017). Store employees had told Licari about Lozada's recent behavior, including comments about "shooting up" the store. *Id.* at 907. Licari obtained written statements from the employees and forwarded them to Hobby Lobby's corporate office. *Id.* Licari was instructed to contact law enforcement and to terminate plaintiff's employment. *Id.*

Licari wrote out a statement for law enforcement, summarizing what he had heard about plaintiff from the other employees. *Id.* One deputy stated he would speak to plaintiff to assess his mental state. *Id.* at 908. Plaintiff was interviewed by law enforcement, civilly committed, and detained for about 36 hours. *Id.*

Plaintiff claimed damages against Hobby Lobby for false arrest. *Id.* at 907. The district court granted summary judgment in favor of Hobby Lobby on plaintiff's false imprisonment claim, holding Hobby Lobby did not instigate plaintiff's arrest. *Id.* The Eleventh Circuit affirmed, rejecting plaintiff's argument that Hobby Lobby's involvement of law enforcement was a directive to have plaintiff arrested. *Id.* at 916-17. The Eleventh Circuit also rejected plaintiff's argument that Hobby Lobby was liable because its employees went beyond mere reporting by asking law enforcement to inform plaintiff that he was fired from his job at Hobby Lobby. *Id.* While acknowledging Hobby Lobby may have gone beyond mere reporting in this instance, the Eleventh Circuit held such actions "did not amount to instigation because it was not equivalent to asking [law enforcement] to arrest [plaintiff]." *Id.*

Archer contends, generally, that Defendants are responsible for the Officers' behavior because Wal-Mart employees "accepted the conduct of the police officers in part by their acquiescence to the officers' conduct toward the plaintiff." Doc. 276 at p. 3. First, the evidence before the Court does not indicate that any Wal-Mart employee "acquiesced" to the Officers' conduct. Rather, the record evidence shows the Officers and the Wal-Mart employees acted in separate scopes: the Officers acted in the scope of their employment as Officers with the City, and not pursuant to any direction from Wal-Mart. Phillips Depo. at 10:6-10:10; Wood Depo. at 43:25-44:1, 57:4-57:8; Gaskin Depo. at 62:24-63:2; SF at ¶ 3e.

Second, Archer provides no support for the premise that a private citizen can be liable for false imprisonment by "acquiescence." To the contrary, as just discussed, such an assertion is not supported by law. To be liable in tort for false imprisonment, a private individual must actually detain a person or must instigate such detention through "an active role." *Harder*, 174 So. 3d at 530. A general statement that a person "acquiesced" to official conduct does not suffice.

*i. Wood*

The summary judgment record offers no support for the premise that Wood actually detained Archer. Wood arrived on scene after Officer Webster, at which time Archer's assumed detention was, according to him, already "well taken care of by Winter Haven PD." Archer Depo. at 163:2-163:7. *See also* Phillips Depo. at 23:19-24:16 (testifying that Wal-Mart turned the matter over to the Officers upon their arrival); Gammon Depo. at 31:15-31:19, 32:18-32:21 (testifying that the Officers took over the situation); Wood Depo. at 43:25-44:1, 57:6-57:8 (stating that Wal-Mart management does not give direction to police).

Indeed, Archer agreed that Wood never stated he was not free to leave. Archer Depo. at 163:2-163:7. The only thing Archer remembers from his conversation with Wood is that she asked him for his receipt. *Id.* at 121:24-122:4, 162:12-163:22. Additional evidence is not contrary: Wood testified that she asked Archer for his receipt but was not stopping Archer from leaving. Wood Depo. at 40:12, 40:24-40:25, 42:12-42:18, 44:8-44:19, 49:4-49:10; 49:25-50:12, 55:20, 56:16-56:24, 57:13-57:14. Wood is not seen on the Video touching Archer nor blocking his path to the exit. Video at 1:40-5:34.

The summary judgment record also offers no support for the premise that Wood instigated Archer's detention by taking an active role in encouraging or procuring a detention by the Officers. Indeed, Wood testified that she was not at liberty to give the Officers any direction during the incident. Wood Depo. at 43:25-44:1. Most critically, there is no evidence concerning what, if anything, Wood said to the Officers that evening. *See* Wood Depo. at 48:8-48:10, 52:13-52:15; Archer Depo. at 173:7-173:15, 175:18-175:24; Gaskin Depo. at 39:10-40:8; Nichols Depo. at 30:9-30:11, 41:9-41:13, 45:4-45:6, 79:19-79:25, 81:7-81:9; Doc. 276-3.

### ii. Caraway

The summary judgment record also offers no support for the premise that Caraway actually detained Archer. Caraway's arrival, like Wood's, was preceded by the arrival of Officer Webster. Video at 00:29-00:47. *See also* Phillips Depo. at 23:19-24:16 (testifying that Wal-Mart turned the matter over to the Officers upon their arrival); Gammon Depo. at 31:15-31:19, 32:18-32:21 (testifying that the Officers took over the situation); Caraway Depo. at 25:23-26:6 (stating that the Officers were dealing with the matter).

Indeed, Archer testified he did not believe Caraway ever told Archer he was not free to leave. Archer Depo. at 158:5-158:19. Additional evidence is not contrary: Caraway testified that he told Archer he was free to go, albeit without the television. *See* Caraway Depo. at 23:15-23:25, 28:4-28:6. Caraway is not seen on the Video touching Archer. Video at 00:36-05:35. When Archer attempted to push the shopping cart forward to leave with the television, Caraway placed his hands on the cart and pointed at Archer. *Id.* at 03:20-03:29. At that moment, Archer did not try to leave without the television. *Id.* at 3:20-3:41. Later, when Archer went to leave without the television, Caraway did not get in the way. *Id.* at 05:26-05:39.

The summary judgment record also offers no support for the premise that Caraway instigated a detention by taking an active role in encouraging or procuring a detention by the Officers. Caraway testified he told the Officers that Archer could not take the television without proof of purchase. Caraway Depo. at 32:18-32:20, 36:13-36:16, 37:16-37:18, 62:14-62:17. There is no record evidence, however, that Caraway told the Officers the equivalent, in words or conduct, that they should not allow Archer to leave, without the merchandise.[15] *See* Caraway Depo. at

---

[15] Caraway agrees he told the Officers to trespass Archer when, at about 7:00 p m., Archer attempted to push the shopping forward in an effort to leave with the television. Caraway Depo. 31:23-32:2. But whether Caraway instructed the Officers to trespass Archer is not at issue with respect to Archer's false imprisonment claim. The only

31:20-32:2, 32:11-32:14, 37:16-37:18; Archer Depo. at 157:20-158:19; 172:17-173:6; Nichols Depo. at 45:7-45:14.

### iii. Harris

The summary judgment record also provides no evidence that Harris instigated Archer's detention by the Officers. There is simply no evidence in the record about what Harris said to any Officer. *See* Archer Depo. at 160:10-162:11, 183:1-183:5; Gaskin Depo. at 86:1-86:2; Nichols Depo. at 80:6-80:9. The evidence shows that Harris gestured by waving to someone, possibly Officer Webster. But waving to attract the attention of law enforcement is not the equivalent of telling law enforcement to detain someone.

Viewing the evidence in a light most favorable to Archer and giving Archer the great benefit of the doubt, however, there is a possible dispute of material fact as to whether Harris actually detained Archer. To be sure, much of the evidence does not support Archer's claim for false imprisonment against Harris. Of the three Wal-Mart employees at the scene, Harris spent the least amount of time with Archer—less than 50 seconds, only 35 of those which were not in the presence of Officer Webster. Video at 00:00-00:50. When Archer refused Harris' request to see a receipt and continued pushing the shopping cart, Harris followed, stepping to the right of Archer, then stepping in front of the shopping cart and placing his hands on the shopping cart. Video at 00:11-00:22; Archer Depo. at 77:19-78:14. Although Harris blocked the shopping cart, he did not physically block Archer. Archer Depo. at 161:15-161:19; Video at 00:11-00:33.

However, Archer testified he was not sure but he believed Harris told him he could not leave without showing his receipt. Archer Depo. at 160:21-162:11, 182:17-183:5. Archer's relevant testimony about Harris is as follows.

---

question is whether Caraway took an active role in encouraging or procuring detention. Archer does not attempt to suggest that a trespass warning is the same as a detention.

A. Well, if we watch that video, you can see that I had some conversation with the first person who stopped me asking for the receipt.

Q. Okay. And that person, do you know who that person is?

A. I do not.

Q. Do you know if that person was -- if that person was an employee of Walmart?

A. I believe that person to have been a Walmart employee.

Q. Okay. And what conversations did you have with that person?

A. He would be the one who initially asked me for my receipt.

Q. Okay. Other than asking you for a receipt, do you recall anything else that he said to you?

A. I don't.

Q. Did you ever -- do you ever recall him saying that you could not leave?

A. I recall him blocking my cart to prevent me from leaving and calling for help.

Q. He blocked the cart. Did he ever block you physically?

A. No.

Q. Okay. And do you ever recall that individual calling you a thief or accusing you of theft?

A. No.

Q. Okay. Other than -- I know I asked this a couple of minutes ago, but I just want to make sure I'm clear. Other than that individual asking you for your receipt, do you recall him saying anything else to you?

A. Well, I can see myself talking with him in the video.

Q. Okay.

A. So I was talking to him for some reason. He must have said something to me.

Q. Okay.

A. But I don't know what.

Q. As you sit here today, you don't know what that conversation was?

A. I do not recall.

. . .


Q. Just a couple of follow-up questions.· Did you hear any of the Walmart employees telling the police that you couldn't leave unless you showed your receipt?

A. I don't recall. Geez, I wish I could. I don't recall hearing them say that.

Q. Did the Walmart employees tell you, you need to show your receipt or you can't leave?

A. I think -- I can't say with certainty, but I believe that that fellow that stopped me that you – the first guy that stopped me, the checker of the receipts, you saw there was some conversation between us. I believe he did say that.

Q. "You can't leave without showing the receipt"?

A. Yes.

Archer Depo. at 160:21-162:11, 182:17-183:5.

It is unclear whether the possible statement by Harris that Archer could not leave without showing his receipt meant that Archer could not leave at all or that he could not leave with the television. Archer's testimony is the only record evidence about what Harris said to Archer that evening.

It is dubious whether Archer's testimony that Harris *may* have said Archer could not leave without a receipt can create a dispute of material fact concerning detention in light of the facts that Harris was alone with Archer for only 35 seconds, Harris did not block Archer but only the shopping cart, and Archer is unsure of what Harris said. However, assuming there is a genuine issue of material fact as to whether Harris detained Archer, the Court assumes for purposes of further analysis that Harris in fact detained Archer, and continues with its assessment of the evidence in view of the elements Archer must ultimately prove.

### 2. *Whether Harris had Probable Cause to Detain Archer*

The next question in the false imprisonment analysis is whether Harris' assumed detention of Archer was unlawful. Under Florida law, a store employee's detention of a person is not unlawful where (1) there is probable cause to believe the person has committed a retail theft and the property can be recovered by taking the offender into custody, (2) the person is held in a reasonable manner and for a reasonable length of time, and (3) law enforcement is called to the scene immediately after the person is taken into custody. Fla. Stat. § 812.015(3)(a); *see also Weissman*, 396 So. 2d at 1166. The issue of probable cause "is a question of law for the court so long as the material facts are undisputed." *Morris*, 705 F.2d at 409. The probable cause necessary to support detention is less than probable cause needed to support later prosecution; that a person might later be found innocent of an alleged theft is not determinative. *Id.* The question is whether

probable cause existed at the time of the detention, under the circumstances existing then. *Food Fair Stores*, 335 So. 2d at 562.

All material facts concerning the issue of probable cause in this case are undisputed. About 35 seconds elapsed between when Harris asked Archer for his receipt and when Officer Webster arrived and placed a hand on the shopping cart. The facts concerning those 35 seconds, as relevant to the Court's probable cause analysis, are as follows. As Archer began his exit, Harris asked Archer to show his receipt for the purchase of the television. SF at ¶ 3h; Archer Depo. at 77:19-78:15, 160:21-162:11. Archer refused to show Harris his receipt. SF at ¶ 3i; Archer Depo. at 77:24-77:25. As Archer pushed the shopping cart toward the exit, Harris followed, stepping to the right of Archer, then stepping in front of the shopping cart and placing his hands on the shopping cart. Video at 00:11-00:22; Archer Depo. at 77:19-78:14. Archer continued to attempt to leave the store with the shopping cart and television, attempting to maneuver around Harris. Video at 00:22-00:28.

The Court concludes from the undisputed facts that Harris had probable cause[16] to detain Archer pursuant to § 812.015(3)(a). Archer's conduct—refusing without reason to show a receipt when asked by a store employee, continuing toward the exit with merchandise despite the employee's additional requests, and attempting to maneuver merchandise around the employee in an effort to leave with it—would lead a reasonable person to conclude a theft may be in progress. *Ciccariello*, 2008 WL 4426710, at *6 (store employee had probable cause to believe customer had committed retail theft at the moment when the customer refused to answer the employee's initial questions and walked away); *Anderson*, 2013 WL 773473, at *7 (hostility upon being asked to

---

[16] In his response, Archer points to Caraway's and Wood's testimony that they did not believe Archer was attempting to steal the television. But Caraway's and Wood's testimony about their actual beliefs upon arriving at the scene 45 seconds after the incident began and one minute and 45 seconds after the incident began, respectively, have no bearing on what Harris, who encountered Archer first, could reasonably have believed under the then-existing circumstances.

display receipt gave arguable probable cause to conclude a crime may have been committed and to investigate further).

There is no question that any detention of Archer by Harris was reasonable under the circumstances. To the extent Harris actually detained Archer, he did so for only 35 seconds, or until Officer Webster arrived. Video at 00:00-00:35. The manner of the alleged detention was also reasonable—Archer was never touched nor taken elsewhere. In addition, as is obvious from Officer Webster's quick arrival on scene, law enforcement was summoned immediately. Because the undisputed facts show Harris had probable cause to detain Archer and followed the mandates of § 812.015(3)(a), any detention of Archer by Harris was not unlawful. Under Florida law, Harris is immune from liability for false imprisonment.

Archer argues, generally, in his response that the Wal-Mart employees had a duty to further investigate Archer's claim that he had just purchased the television at the checkout area located nearby. Doc. 276 at pp. 2, 7. But there is no record evidence that Archer told Harris he had just paid for the television by checking out nearby. The only evidence concerning Harris and Archer's communication is that Harris asked for Archer to display his receipt, Archer refused, and Harris may have told Archer that he could not leave without showing a receipt. Archer Depo. at 77:19-78:15, 160:21-162:11. Finally, even if Archer had told Harris that he had just paid for the television nearby, it would be unreasonable for Archer to assert that Harris should have investigated that claim and reached a resolution within the 35 seconds before Officer Webster arrived, during which time Archer continued his attempt to leave with the merchandise.

*3. All Defendants are Entitled to Summary Judgment on Archer's False Imprisonment Claim*

The moving party has met its burden to show a lack of evidence to support an essential element of Archer's claim for false imprisonment, detention, against Wood and Caraway. And Archer has failed to designate evidence showing a genuine issue of material fact. Therefore, Wood and Caraway are entitled to summary judgment on Archer's claim for false imprisonment.

Viewing the evidence in a light most favorable to Archer and giving Archer the great benefit of the doubt, there is a possible dispute of material fact as to whether Harris actually detained Archer. Nonetheless, the undisputed facts show Harris had probable cause to detain Archer. Therefore, any detention of Archer by Harris was lawful. Accordingly, Harris is also entitled to summary judgment on Archer's claim for false imprisonment.

Archer's claim against Wal-Mart for false imprisonment apparently relies on a respondeat superior theory. *See* doc. 237 at ¶ 74. Because the Court finds Wood, Caraway, and Harris are entitled to summary judgment in their favor on Archer's claim for false imprisonment, Archer's claim for false imprisonment against Wal-Mart is not viable. Wal-Mart is therefore also entitled to summary judgment on Archer's false imprisonment claim.[17]

## B. Count III – Conversion as to Wal-Mart, Wood, Caraway

Under Florida law, conversion is an "unauthorized act which deprives another of his property permanently or for an indefinite time." *Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1291 (11th Cir. 2001). To prove conversion, a plaintiff must "show ownership of the subject

---

[17] Because the Court finds Defendants are entitled to summary judgment on Archer's false imprisonment claim on Defendants' first two arguments, it need not reach the third issue Defendants raise regarding whether Archer consented to detention.

property and facts that the other party wrongfully asserted dominion over that property." *Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011).

### 1. *Wood*

The parties agree that Sergeant Gaskin took the television out of Archer's shopping cart. SF at ¶ 3n; Video at 03:21-03:39; Archer Depo. at 187:19-188:7. The undisputed evidence also shows that after the Officers and Archer left, Caraway took the television and stored it in the asset protection office. SF at ¶ 3s; Video at 7:30-8:00. There is no record evidence, however, that Wood had anything to do with the taking of the television. And Archer has failed to designate specific facts showing a genuine issue of material fact. Therefore, Wood is entitled to summary judgment on the conversion count as to her.

### 2. *Caraway*

Archer argues Caraway "wrongfully assert[ed] dominion over" the television by placing it in the asset protection office after Archer and the Officers left. Doc. 276 at p. 17. To the extent Caraway could be said to have been involved in the deprivation of Archer's television, such deprivation was temporary. The undisputed evidence shows Caraway had no intent to keep the television permanently or for an indefinite period of time. Caraway specified that Archer could take the television upon Wal-Mart's receipt of proof of purchase. Caraway Depo. at 32:18-32:20, 36:13-36:16, 37:16-37:18, 62:14-62:17; Doc. 276-3. Indeed, after Wal-Mart confirmed the purchase, Archer was informed that he could return to the store to pick up the television. Archer Depo. at 105:18-106:4; Phillips Depo. at 31:2-31:7. Archer does not dispute that he could have left the store with the television on November 26, 2015 by showing proof of purchase, and does not dispute that he was later informed that he could either pick up the television or receive a refund. Archer Depo. at 93:12-93:14, 105:18-111:4. That Archer does not approve of the manner in which

Wal-Mart attempted to effectuate a return or refund does not support a claim for conversion. *See id.* at 106:24-107:6 ("I expected that I should be issued a letter of apology from Walmart. Someone should come knocking on my door delivering that TV. I have no obligation to go down there and kiss their butt and ask them for my own TV that I duly paid for. No. I felt the obligation was on their part, and they shirked their obligation. Blew me off like I was a leaf in the wind.").

Despite Archer's attempts to obfuscate the summary judgment record, doc. 276 at p. 16, the material facts surrounding Archer's claim for conversion are undisputed. Because there is an absence of evidence to support an essential element of Archer's claim for conversion, and because Archer has failed to designate specific facts to show a genuine issue of material fact, Caraway and Wal-Mart[18] are entitled to summary judgment as to this claim.

### C.  Count VII – Negligence of Walmart and Camp – Negligent Training

A successful claim for negligent training under Florida law requires a plaintiff to establish he "was harmed as a result of an employer's failure to adequately train an employee, and that the nature of the employment put the plaintiff in a 'zone of risk' such that the employer had a duty running to the plaintiff." *Adler v. WestJet Airlines, Ltd.*, 31 F. Supp. 3d 1381, 1388 (S.D. Fla. 2014). *See also Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1265 (11th Cir. 2001) ("Under Florida law, an employer is liable in tort for reasonably foreseeable damages resulting from the negligent training of its employees and agents.").

Archer's claim for negligent training is based on two related but separate duties which Archer alleges Wal-Mart and Edward Camp ("Camp") owed. First, Archer alleges Camp and Wal-Mart owed him a duty to properly train employees in the implementation of the store policy.

---

[18] Archer's claim against Wal-Mart for conversion again apparently relies on a respondeat superior theory. *See* doc. 237 at ¶¶ 104-105.

Second, Archer alleges Camp and Wal-Mart owed him a duty to properly train employees in the identification of customers suspected of shoplifting.

*1. Camp*

There is almost no record evidence about Camp, a store manager whom Archer alleges had a duty to train employees in the Wal-Mart policy and had a duty to train employees in the identification of shoplifting patrons. *See* Archer Depo. at 156:6-157:4, 171:9-172:14; Gaskin Depo. at 36:10-36:21, 85:23-85:25; Nichols Depo. at 30:20-31:2, 80:1-80:5, 80:17-80:18, 81:10-81:12. The only evidence about Camp is that he apparently managed the Wal-Mart store on the day of the incident. Caraway Depo. at 38:24-39:9.[19] There is no evidence that Camp had a responsibility to train Wal-Mart employees in the policy or in shoplifting identification, nor that Camp was derelict in such duties. Because no evidence supports Archer's claim for negligent training as to Camp, and because Archer has failed to designate specific facts showing a genuine dispute of material fact as to this issue, Camp is entitled to summary judgment.

*2. Wal-Mart*

a. Duty to train regarding store policy

Archer's claim that Wal-Mart had a duty to properly train its employees in the implementation of store policy relies upon the Wal-Mart policy provision stating that a store employee should "allow [a customer who refuses to show a receipt] to leave, and [then] document the event" on a standard form and notify management or asset protection. Doc. 276-1. According to Archer, the policy "was designed to be implemented so that any customer that refused to show his or her receipt should nevertheless be free to leave the store with his or her merchandise and not detained and not have their property taken from them." Doc. 237 at ¶ 156. Archer alleges Wal-

---

[19] Even this, however, is unclear. Wood testified that she was not sure if Camp still managed the store on that day. Wood Depo. at 11:21-12:19.

Mart failed to properly train its employees in the proper implementation of this policy, evidenced by the fact that Wood, Caraway, and Harris failed to permit Archer to leave the store with his merchandise after he refused to show his receipt. *Id.* at ¶ 157; Doc. 276 at pp. 18-19.

As an initial matter, it is unclear why Archer believes the policy creates a legal duty from Wal-Mart to customers. The evidence shows the policy was not created for the purpose of protecting customers, as Archer alleges, but was put in place for the protection of Wal-Mart's employees. Gammon Depo. at 7:21-7:23, 22:22-23:5. In addition, there is evidence that the policy was intended for implementation by only certain Wal-Mart employees, such as greeters or receipt checkers, not all Wal-Mart employees. Wood Depo. at 15:1-15:6; Caraway Depo. at 17:14-17:17, 20:3-20:4, 27:3-27:6, 28:22-29:5. Archer's response fails to identify specific facts showing a genuine issue of material fact as to duty.

Even assuming the policy did create a legal duty from Wal-Mart to Archer, the evidence shows the policy was either amended or not in place on the evening of the incident because the store was having a special event that was anticipated to draw a large crowd. SF at ¶¶ 3a-3b; Wood Depo. at 15:18-15:25, 58:3-58:9; Caraway Depo. at 23:15-23:19; Gammon Depo. at 15:17-15:24. On this point, Archer also fails to designate specific facts to create a genuine issue of material fact.

Finally, assuming the policy created a legal duty from Wal-Mart to Archer *and* assuming the policy was in force on November 26, 2015, no record evidence supports Archer's assertion that the policy was violated.[20] Of the individuals named in Archer's complaint, only Harris, as a receipt checker, may have been subject to implementing the policy. Wood Depo. at 15:1-15:6; Caraway Depo. at 17:14-17:17, 20:3-20:4, 27:3-27:6, 28:22-29:5. The undisputed evidence shows that before the Officers arrived, Harris communicated with Archer for about 35 seconds in an effort

---

[20] Indeed, one witness who reviewed the incident testified he thought the policy was followed. Gammon Depo. at 18:21-19:3.

to obtain proof of purchase. Video at 00:00-00:35; SF at ¶ h. The policy does not specify for how long an employee should attempt to obtain a receipt or at what point the employee should allow the customer to leave. *See* doc. 276-1. And within seconds, Officer Webster and other Wal-Mart employees had arrived, mooting Harris' and the policy's presumed involvement. Caraway Depo. at 27:3-27:17; Phillips Depo. at 23:19-24:16; Gammon Depo. at 31:15-31:19, 32:18-32:21. Again, Archer fails to designate specific facts to create a genuine issue of material fact as to violation of the policy.

   b. Duty to train regarding identification of suspected shoplifters

 Archer also alleges Wal-Mart owed him a duty to properly train its employees in the identification of customers suspected of shoplifting and that Wal-Mart breached that duty by failing to train its employees, as evidenced by Archer's improper detention.

 As discussed *supra*, to the extent Harris detained Archer, he had probable cause to do so when Archer refused without reason to show a receipt, continued toward the exit with merchandise despite additional requests, and attempted to maneuver merchandise around Harris in an effort to leave with it. Given that he had probable cause, there is no evidence Harris improperly identified Archer as a possible shoplifter.

 Defendants have met their burden to show a lack of evidence concerning Wal-Mart's failure to train its employees in either the proper implementation of the policy or in the identification of potential shoplifters, and Archer has failed to designate specific facts creating a genuine issue of material fact on any pertinent issue. Wal-Mart, therefore, is also entitled to summary judgment on this count.

## IV.    CONCLUSION

Defendants, as the moving parties, have met their burden to identify portions of the record demonstrating an absence of genuine issues of material fact, and/or have met their burden to show an absence of evidence to support Archer's claims. Archer, however, has failed to designate specific material facts bearing on any dispositive issue. Defendants are entitled to summary judgment on all of Archer's remaining claims.

Accordingly, it is **ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. 259) is **GRANTED.**

2. The Clerk is directed to enter a judgment in favor of Defendants, Wal-Mart Stores East, LP, Kristina Wood, Charles Caraway, Edward Camp, and Kanara Harris and against Plaintiff, Darrell Archer. The Clerk is further directed to terminate any pending motions and deadlines and to close this case.

**DONE AND ORDERED** in Tampa, Florida on January 15, 2020.

Charlene Edwards Honeywell
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any