[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10547
Non-Argument Calendar

_____

D.C. Docket No. 8:16-cv-03067-CEH-AAS

DARRELL ARCHER,

Plaintiff - Appellant,

versus

CITY OF WINTER HAVEN,
a Florida municipality, et al.,

Defendants,

EDWARD CAMP,
CHARLES CARAWAY,
KRISTINE WOOD,
KANARA HARRIS,
WAL-MART STORES EAST, LP,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(February 9, 2021)

Before JORDAN, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Darrell Archer purchased a television from a Winter Haven, Florida Wal-Mart store during a Thanksgiving Day sale in 2015.  When a Wal-Mart employee asked to see Archer's receipt as he was leaving with the unbagged television in his shopping cart, Archer refused.  Less than a minute later, police officers on site attempted to intervene.  Archer still refused to show his receipt.  Several minutes later, Archer left the store without his television.

After Wal-Mart verified that Archer purchased the television, he was informed that he could pick it up or receive a refund.  Archer filed this lawsuit instead.  The district court granted Wal-Mart and its employees' motion for summary judgment on Archer's claims for false imprisonment, conversion, and negligent training.  For the reasons explained below, we affirm.

## I.    Background

A. Wal-Mart's Receipt Checking Policy

To protect its assets, Wal-Mart uses a receipt-checking policy that establishes the procedures receipt-checking employees should take to verify purchases as customers leave the store.  As pertinent here, the policy instructs the receipt-checking employee to "[s]elect customers for receipt checking when [they have]. . . [l]arge unbagged high[-]value items" such as "all TVs[.]"  If a customer

2

"refuses to produce a receipt," the policy says the employees should "[p]olitely offer to hold the merchandise until the customer can find their receipt." If the customer refuses this request, the employee should "allow them to leave," document the event, and notify management or the asset protection team immediately. After this happens, the store will normally contact the police and allow them to investigate any potential theft. Mark Gammon, Wal-Mart's corporate representative, explained that the part of the policy provision that allows customers to leave after refusing to show their receipt is for the employee's protection and to avoid a "combative situation."

B. Archer Incident

Archer was shopping at Wal-Mart on November 26, 2015, during a "major sales event" that attracted a "magnitude of people." Because of the sale, normal operations at the Wal-Mart were changed. First, police were on site and ready to respond to any situations. Second, Wal-Mart employees testified that the receipt checking policy was "altered" that day. For example, the receipt-checking employee was requiring receipts from everyone instead of just for the items specially listed in the policy.

After shopping in the crowded store, Archer purchased a large screen television for $159.47 using the self-checkout line. Archer placed his receipt in his pocket and headed towards the exit with the unbagged television in his shopping

cart.  A Wal-Mart employee, Kanara Harris, asked Archer if he could see his receipt.  Archer refused and pushed his cart towards the exit.  Video evidence showed that Harris followed, stepped in front of the shopping cart, and placed his hands on the cart.  Archer attempted to maneuver around Harris and exit the store.  Archer, in his deposition, stated five times that he did not remember anything else Harris said to him besides asking to see his receipt.  Later in his deposition, Archer said he could not "say with certainty," but he "believed" that Harris told him he could not leave without showing his receipt.  Less than a minute after Harris originally asked Archer for his receipt, Harris waved to someone, and a few seconds later, Officer Webster arrived at the scene.  Harris then left the scene and returned to his duties.

Within approximately the next two minutes, two other Wal-Mart employees (Charles Caraway and Kristina Wood) and two other officers (Sergeant Nichols and Sergeant Gaskin) arrived on the scene.  Archer testified that during this time, one of the officers told him he was not allowed to leave.  But Sergeant Gaskin testified that no one ever told Archer he was not free to leave.  Caraway testified that Archer was told "over and over again that [he] w[as] free to go."  Caraway further testified that Archer "was free to leave at all times" but could not take the television unless he "proved that [he] purchased it."  At one point during the incident, Caraway placed his hands on Archer's cart when Archer tried to leave the

store with the television, but Carraway never physically detained Archer, and Archer testified that he did not believe Caraway ever told Archer he was not free to leave the store.  Wood testified that the officers told Archer he was free to leave at any time, and she "was not stopping [Archer] from leaving, even with the television set."

Sergeant Nichols testified that during this time Archer raised his voice, pointed a finger at the officers and Wal-Mart employees, and was argumentative. Archer testified that at one point, one of the officers told him that he could arrest Archer for theft.  But Caraway and Wood testified they never heard any of the officers threaten to arrest Archer.  Throughout the encounter, Archer continued to refuse to provide his receipt.

After approximately three minutes, Archer attempted to leave the store with his television.  Sergeant Gaskin removed the television from Archer's shopping cart and set it on the floor.  Caraway requested that Archer be removed from the property.  Archer left the store without the television because he thought he would be arrested if he did not leave.  The video footage shows that approximately five minutes elapsed from when Harris initially asked Archer for his receipt and when Archer left the store.  During that time Archer was never moved from the scene of the incident, taken to another room, or arrested.

After Archer left, Caraway stored the television in Wal-Mart's asset protection office.  Wal-Mart employees later verified that Archer had purchased the television.  Days later, Archer went to the police department to discuss the incident.  Later, the police officer Archer spoke with about the incident called him and informed him that he could pick up his television from the store or receive a refund at Wal-Mart's customer service desk.  Archer does not recall ever attempting to recover his television from Wal-Mart.

C.  Archer's Claims

Archer sued Wal-Mart,[1] three Wal-Mart employees (Harris, Caraway, and Wood), and three Winter Haven police officers (Officer Webster, Sergeant Gaskin, and Sergeant Nichols) for false imprisonment.  He also sued those same four employees and three officers for conversion.  Archer also sued Wal-Mart and the Winter Haven Wal-Mart store manager Edward Camp for negligent training of its employees on implementing the receipt-checking policy.  Archer later settled his claims with the Winter Haven police officers.

The district court granted summary judgment to Wal-Mart and its employees on Archer's claims for false imprisonment, conversion, and negligent training.  Archer appealed.

---

[1]  Archer sued Wal-Mart Stores East, LP; this opinion will refer to the entity as "Wal-Mart."

## II. Standard of Review

We review a grant of summary judgment *de novo*. *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009). "Summary judgment is appropriate if the record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Teagan v. City of McDonough*, 949 F.3d 670, 675 (11th Cir. 2020). As the non-moving party, Archer "is entitled to have all evidence and reasonable factual inferences viewed in his favor." *Campbell*, 586 F.3d at 840.

## III. Analysis

Archer raises three issues on appeal. First, he argues that Wal-Mart employees falsely imprisoned him as he tried to leave the store. Second, Archer argues that Wal-Mart employees converted his property when they removed the television set from his cart. And third, Archer argues that Camp—and by extension Wal-Mart—negligently trained his employees because the employees failed to follow the receipt-checking policy during the incident. Because Archer cannot show a genuine issue of material fact that could support his claims under Florida law, the district court properly granted summary judgment to the defendants.

A. False Imprisonment

Under Florida law, "[f]alse imprisonment is the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and deprivation of his liberty." *Johnson v. Weiner*, 19 So. 2d 699, 700 (Fla. 1944). To state a cause of action for false imprisonment, the plaintiff must establish : "1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or 'color of authority' . . . 4) which is unreasonable and unwarranted under the circumstances." *Harder v. Edwards*, 174 So. 3d 524, 530 (Fla. 4th Dist. Ct. App. 2015) (quoting *Montejo v. Martin Mem'l Med. Ctr., Inc.*, 935 So. 2d 1266, 1268 (Fla. 4th Dist. Ct. App. 2006)).

Florida's shopkeeper's statute protects a merchant from civil liability for false imprisonment when the merchant has probable cause to believe that the person detained has committed theft. *Morris v. Albertson's Inc.*, 705 F.2d 406, 409 (11th Cir. 1983). The statute provides in pertinent part:

> [A] merchant . . . who has probable cause to believe that a retail theft . . . has been committed by a person and . . . that the property can be recovered by taking the offender into custody may, for the purpose of attempting to effect such recovery or for prosecution, take the offender into custody and detain the offender in a reasonable manner for a reasonable length of time[.]

Fla. Stat. § 812.015(3)(a). The probable cause required to satisfy the statute "does not reach the level of probable cause required to support a later prosecution."

8

*Weissman v. K-Mart Corp.*, 396 So. 2d 1164, 1167 (Fla. 3d Dist. Ct. App. 1981);

*see also State v. Outten*, 206 So. 2d 392, 397 (Fla. 1968) ("The facts constituting

probable cause [for an arrest] need not meet the standard of conclusiveness and

probability required of the circumstantial facts upon which conviction must be

based."). The fact that the plaintiff was not actually guilty of shoplifting does not

affect the probable cause determination. *See Rothstein v. Jackson's of Coral

Gables, Inc.*, 133 So. 2d 331, 332 (Fla. 3d Dist. Ct. App. 1961).

The district court found that no record evidence supported Archer's claim

that Wood or Caraway actually detained Archer, though it did conclude that there

was a possible disputed issue of material fact as to whether employee Harris

detained Archer. But the court concluded that even if Harris did detain Archer, he

had probable cause to do so and, therefore, the detention was allowed under the

Florida shopkeeper's statute. After careful review, we agree with the district court

that employees Wood and Caraway did not detain Archer. And Harris, if he

detained Archer, had probable cause to do so.

Archer advances four theories concerning his false imprisonment claim.

First, Archer contends that the police officers detained him[2] and Wal-Mart

---

[2] Archer's theory that the officers detained him is based on his disputed testimony that one officer threatened to arrest him for theft and one officer told him he was not allowed to leave the store.

employees Wood, Caraway, and Harris are liable for indirectly detaining him because they instructed the police officers to do so.

"To be liable in an action for false imprisonment, one must have personally and actively participated therein, directly or by indirect procurement." *Johnson*, 19 So. 2d at 701. A citizen does not "indirectly procure" a detention simply by providing information to law enforcement that leads to detention. *Pokorny v. First Federal Savings & Loan Ass'n of Largo*, 382 So. 2d 678, 682 (Fla. 1980) ("If the private citizen makes an honest, good faith mistake in reporting an incident, the mere fact that his communication to an officer may have caused the victim's arrest does not make him liable when he did not in fact request any detention."). In *Pokorny*, the Florida Supreme Court held that "a private citizen may not be held liable in tort where he neither actually detained another nor instigated the other's arrest by law enforcement officers." 382 So. 2d at 682. To "instigate" an arrest, the defendant must have taken an active role in encouraging or procuring the wrongful arrest which "is the equivalent in words or conduct to 'Officer, arrest that man.'" *Harder v. Edwards*, 174 So. 3d 524, 530–31 (Fla. 4th Dist. Ct. App. 2015) (quotation omitted). In *Pokorny,* the Supreme Court explained that:

> It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.

10

382 So. 2d at 682 (quoting Restatement (Second) of Torts, § 45A cmt. c).

Even assuming that the police officers' actions rose to the level of "detention" required for Archer's *prima facie* false imprisonment claim,[3] the Wal-Mart employees did not "instigate" Archer's detention. The officers were in full uniform and acting in their official capacity for the city, not as Wal-Mart security guards. Though Harris waved over the officers after Archer refused to show his receipt, and Caraway told officers that Archer could not leave the store with the television without showing his receipt, these actions left the ultimate discretion of whether to detain Archer with the officers. In other words, the employee's actions did not amount to a statement like "Officer, arrest that man." *Harder*, 174 So. 3d at 531.

Second, Archer contends that Caraway unlawfully detained him by telling him he could leave the store with his television without showing his receipt. Archer points us to no authority that withholding personal property of this nature can constitute false imprisonment. In explaining confinement, the Florida Supreme Court has instructed that "[a] person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with

---

[3] Whether there was a detention at all is disputed. The entire incident lasted approximately five minutes, and Archer left without ever being arrested or removed from the exit of the store. Archer's assertion that the officers detained him is based on his testimony that one of the officers told him he was not free to go, and one officer threatened to arrest Archer for shoplifting. We view these facts in the light most favorable to Archer, so we will assume that the officers' actions constituted detention.

knowledge that such confinement will, to a substantial certainty, result from it."

*Johnson*, 19 So. 2d at 700 (quotation omitted).  We are not persuaded that Caraway

knew "to a substantial certainty" that holding Archer's television until he showed

his receipt would result in confinement.  Caraway asked for Archer's receipt to

ensure that he had purchased the television; Caraway did not ask for the receipt for

the purpose of imposing confinement.  Thus, we reject Archer's argument.

It is true that some jurisdictions have concluded that withholding personal

property necessary to the person's means of escape can constitute false

imprisonment.  *See, e.g.*, *Helstrom v. N. Slope Borough*, 797 P.2d 1192, 1199

(Alaska 1990) (holding that the deprivation of a plane ticket sufficiently confined a

person).  But *Helstrom* is not analogous to Archer's assertion that withholding his

television constituted false imprisonment.  As *Helstrom* explained, the plane ticket

was the plaintiff's "only reasonable means of departure[.]"  *Id.*  By contrast,

Archer had other reasonable means to depart the Wal-Mart store.  Archer could

have left the store and escaped any confinement by either showing Caraway his

receipt or leaving the store without his television, which he eventually did.

Accordingly, Carraway's statement to Archer did not constitute false

imprisonment.

Third, Archer contends that Caraway directly physically detained him by

placing his hands on Archer's shopping cart.  This argument also fails.  At one

point during the incident, Caraway placed his hands on Archer's cart when Archer tried to leave the store with the television.  But Caraway never physically prevented Archer from leaving.  Archer testified that he did not believe Caraway ever told Archer he was not free to leave the store.  Further, Caraway was present when Archer did in fact leave the store without his television.  Thus, Caraway's action of placing his hands on Archer's shopping cart did not rise to the level of "unlawful restraint of a person against his will . . . and [the] deprivation of his liberty." *Johnson*, 19 So. 2d at 171.

Fourth, and finally, Archer argues Harris falsely imprisoned him because Harris told him he could not leave the store without showing his receipt.  Archer, in his deposition, said five times that he did not remember anything else Harris said to him during the incident besides asking to see his receipt.  But later in his deposition, Archer said he could not "say with certainty," but he "believed" that Harris told him he could not leave without showing his receipt.[4]  The district court concluded that even if this created a disputed fact about whether Harris detained Archer, Harris had probable cause to do so.  We agree.

---

[4]  We agree with the district court that this statement could be read to mean that that Archer could not leave the store *with his television* without showing his receipt (like Archer testified Caraway later said).  But because we make all inferences in Archer's favor, we will assume that Harris meant that Archer could not leave at all—even without the television— without showing his receipt.

Undisputed facts in the record demonstrate that Harris had probable cause to believe that Archer was shoplifting.  In the approximately 35 seconds Harris and Archer interacted before the first officer arrived, Archer was exiting the store with an unbagged television in his shopping cart, Harris asked to see his receipt for the television, and Archer refused.  Then Archer pushed his shopping cart towards the exit, Harris followed, stepped in front of the shopping cart, and placed his hands on the shopping cart.  Archer continued to try to maneuver around Harris to exit the store with the unbagged television.

For those reasons, Harris had probable cause to detain Archer pursuant to Fla. Stat. § 812.015(3)(a).  Archer's actions would lead a reasonable person to conclude that Archer may have been trying to steal the television.  Section 812.015(3)(a) also requires that the merchant's detention be "in a reasonable manner" and "for a reasonable length of time."  Harris's "detention" of Archer easily meets these requirements.  To the extent Harris "detained" Archer, it lasted for only 35 seconds until the police officers arrived on the scene.  And Harris did not touch Archer or remove him from the store exit area.

Accordingly, Archer's false imprisonment claims against Caraway, Wood, and Harris fail.

B. Conversion

Next, Archer argues that Wal-Mart employees committed the tort of conversion when they refused to allow Archer to remove the television from the store.  We disagree.

Under Florida law, a conversion is "an unauthorized act which deprives another of his property permanently or for an indefinite time." *Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1291 (11th Cir. 2001) (quotation omitted); *see also Senfeld v. Bank of Nova Scotia Tr. Co. (Cayman)*, 450 So. 2d 1157, 1160–61 (Fla. 3d Dist. Ct. App. 1984).  The "essence of conversion is not the possession of property . . . but possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property[.]" *Senfeld*, 450 So. 2d at 1161.

The district court found that Archer's conversion claim failed because there were no facts in the record to support the essential elements of Archer's conversion claim.  As to Wood, the district court found there was no record evidence that Wood took Archer's television.  As to Caraway, the district court found that the undisputed evidence shows Caraway had no intent to keep Archer's television "permanently or for an indefinite period of time."  We agree.

The record evidence shows that Sergeant Gaskin initially took the television out of Archer's shopping cart, and later, after Archer left, Caraway stored the

15

television in the asset protection office.  Neither Caraway nor any other Wal-Mart

employee had the intent to deprive Archer of the television "permanently or for an

indefinite time." *Fogade*, 263 F.3d at 1291.  Rather, the record shows that

Caraway told Archer he could take the television if he showed him his receipt.

And after Wal-Mart later confirmed that Archer purchased the television, Archer

was told by a police officer that he could return to the store to pick up his

television or receive a refund.  In short, the record shows that Caraway intended

only to prevent Archer's removal of the television from the store long enough to

confirm that Archer owned it and that Caraway did not intend to deprive Archer of

his property permanently.  Because these facts are undisputed, the district court

properly granted summary judgment to the Wal-Mart employees on Archer's

conversion claim.

C. Negligent Training

Finally, Archer contends that Wal-Mart and Camp negligently trained their

employees to follow Wal-Mart's receipt-checking policy and negligently trained

their employees to deal with suspected shoplifters.  Under Florida law, an

employer may be liable for "reasonably foreseeable damages resulting from the

negligent training of its employees." *Lewis v. City of St. Petersburg*, 260 F.3d

1260, 1265 (11th Cir. 2001).  As in other negligence causes of action, the elements

of duty, breach, causation, and damages must be shown in negligent training

claims. *Watson v. City of Hialeah*, 552 So. 2d 1146, 1149 (Fla. 3d Dist. Ct. App. 1989). A plaintiff asserting a negligent training claim must allege that he was harmed by an "employer's failure to adequately train an employee[] and that the nature of the employment put the plaintiff in a 'zone of risk' such that the employer had a duty running to the plaintiff." *Alder v. WestJet Airlines, Ltd.*, 31 F. Supp. 3d 1381, 1388 (S.D. Fla. 2014).

The district court rejected Archer's negligent training claim. It found that: (1) Archer failed to identify facts showing Wal-Mart owed him a duty to train its employees to implement the receipt-checking policy; (2) the evidence shows the policy was either amended or not in place during the incident; (3) Archer failed to identify facts showing that Wal-Mart employees violated the policy; and (4) Archer failed to show that Wal-Mart violated any duty to train its employees to identify suspected shoplifters because Harris, the only employee that arguably detained Archer, had probable cause to do so.

As best we can tell, Archer seems to argue on appeal that the district court erred for two reasons. First, Archer contends that Wal-Mart employees were negligently trained because they did not follow the receipt-checking policy. Second, apart from the policy, Archer contends that Wal-Mart and Camp negligently trained their employees to respect the rights of customers suspected of shoplifting.

Archer's first argument fails because Archer failed to identify facts showing that the Wal-Mart receipt-checking employee —the only employee involved in the incident that the policy applied to—violated the policy (either the normal one or the modified one in place for the holiday) during the Archer incident.  On the day of the incident, Harris was serving as the receipt-checker.  Both the normal and the holiday policies[5] dictate that the receipt-checking employee should ask all customers purchasing televisions to see their receipts as they leave the store.  If such a customer "refuses to produce a receipt," the receipt-checking employee should "[p]olitely offer to hold the merchandise until the customer can find their receipt."  If the customer refuses this request, the policy says the employee should "allow them to leave" and notify management or the asset protection team—who would typically contact the police to investigate theft.  Beyond this basic guidance, the policy is not very specific.  For instance, it does not say whether the receipt-checking employee should allow a customer who refuses to produce his receipt to

---

[5]  To the extent Archer is separately arguing that Wal-Mart negligently trained its employees by altering its receipt-checking policy on Thanksgiving Day or by violating the altered version of the policy, that argument also fails.  First, no caselaw suggests that a store cannot have special policies and procedures in place during a special event—like a crowded sale.  Second, the modified receipt-checking policy was identical to the original policy in all material respects as it related to Archer.  Because he was attempting to leave the store with an unbagged television in his cart, he would have been subject to receipt checking under the original policy (requiring receipts from customers with large, unbagged, high-value items) or the modified policy (requiring receipts from all customers).  Accordingly, the fact that the receipt-checking policy was modified on the day in question does not aid Archer's argument that Wal-Mart and Camp negligently trained their employees.

leave the store with or without his merchandise.  It also does not specify how long the receipt-checking employee should attempt to obtain proof of purchase before allowing the customer to leave.

The record shows that Harris communicated with Archer (who was leaving the store with a television) for about 35 seconds in an effort to obtain proof of purchase.  During that communication, Harris asked Archer for his receipt (as the policy required), and Harris placed his hands on Archer's cart for a brief moment.  After that, the police officers working security at Wal-Mart were called over to handle the situation.  The facts surrounding the 35 second interaction do not demonstrate that Harris violated the receipt-checking policy.  Accordingly, Archer's first theory of negligent training fails.

Archer's second argument, that Wal-Mart and Camp negligently trained their employees to deal with customers suspected of shoplifting also fails.  As explained above, Archer failed to demonstrate that Wal-Mart employees violated his legal rights during the incident.  So Wal-Mart and Camp did not negligently train their employees to deal with customers who refuse to produce proof of purchase.  Accordingly, we affirm the district court's grant of summary judgment to Wal-Mart and its employee Camp on Archer's negligent training claim.[6]

---

[6] On appeal, Archer also cites, without discussion, a Florida case concerning *respondeat superior*. *See Mercury Motors Express, Inc. v. Smith*, 393 So. 2d 545 (Fla. 1981).  To the extent Archer is arguing that Wal-Mart is vicariously liable for the negligence of Camp, that claim fails

## IV.   Conclusion

For the reasons explained above, we affirm the district court's grant of

summary judgment to Wal-Mart and its employees.

**AFFIRMED.**

---

because, as explained above, Archer did not point to record facts that Camp was liable for
negligently training Wal-Mart's employees.

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

February 09, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  20-10547-JJ
Case Style:  Darrell Archer v. Edward Camp, et al
District Court Docket No:  8:16-cv-03067-CEH-AAS

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against the appellant.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Tiffany A. Tucker, JJ at (404)335-6193.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs